Pineda-Teruel v. Garland Good morning, Your Honors, and may it please the Court. My name is Semida Kulor, and I represent Petitioner Jose Edin Pineda-Teruel. This Court should ensure that judicial efficiency does not eviscerate due process for pro se litigants and reverse the agency's decision to deny Mr. Pineda's claims for relief under the Convention Against Torture and Withholding of Removal. On his convention claim, we asked this Court to reverse the agency's decision because the agency committed significant errors of law and fact. And on his withholding claim, we asked this Court to remand the case for further fact-finding because the immigration judge failed to develop the factual record on key elements of his claim. Ms. Kulor, what is Mr. Pineda-Teruel's best evidence that the threats and extortion were motivated by his membership in the category of wealthy landowners? Is that not contrary to his testimony that he was targeted only because he had recently returned from the United States and was perceived to have money for that very reason? Your Honor, when Mr. Pineda made those statements that you referenced, he was ultimately presenting this information as a detained pro se litigant who was not aware of the elements of the legal claim and was also not equipped to articulate such a complicated and nuanced legal claim. But here, even in spite of making those statements, that didn't strip the judge of their duty to explore all possible bases for particular social group claims that were supported by the factual record. And here on page 23 of the record, Mr. Pineda clearly stated that he was a landowner. And this should have been enough to trigger additional questioning. And that's why Mr. Pineda ultimately seeks a remand on this case because of the immigration judge's failure to develop the factual record on key elements of the claim. And this is a duty that has the duty of an immigration judge to establish the factual record is one that has been well recognized by this circuit and many others. In fact, it's a duty that's rooted in the text of the Immigration and Nationality Act. And it's also a duty that's that has been ruled to be even more significant and important for pro se litigants. So when an applicant reveals some testimony that has been legally recognized to serve as the basis for an element of their claim, the immigration judge has a duty to follow up and ask relevant follow up questions to further explore that particular testimony. And here, Mr. Pineda revealed two critical pieces of testimony and the judge failed to sufficiently follow up on either point. Regarding the particular social group element, as we had been discussing, Mr. Pineda clearly expressed that he was the owner of a coffee plantation. And the immigration judge here asked absolutely no follow up questions aside from confirming that he was the owner. In fact, Mr. Pineda has also provided... Ms. Klor, can I interrupt you there? I have a question about the convention, but I want to ask this question first. He said that he was a coffee plantation owner, which he owned before he left from the United States. But he didn't say that he was confronted by the police or the mafia because he owned the plantation. He said he was confronted from the police because they assumed that because he had been in the United States, he had some money. So the connection that I made was his trip to the United States, coming back with money, which really has nothing at all to do with being a landowner. He could have lived in an apartment somewhere. The police confronted him and the mafia confronted him because he had come to the United States, not because he owned a coffee plantation. Your Honor, ultimately here, ultimately the case is about holding immigration judges accountable to their duties. And here this court has held that wealthy landowners... She doesn't have to make the argument for him. I mean, he said the police confronted me because I had come to the United States and they thought that I had money. She doesn't need to say, oh, well, let's link that to your ownership of the coffee plantation. Explain to me what that had to do with it and develop that on his behalf. Your Honor, while the judge need not formulate legal theories for Mr. Pineda, when he mentioned he mentioned he was a landowner before he had the discussion with the immigration judge about this alternative, potential alternative theory. And so given the extensive knowledge that judges have about the law, mentioning that he was a landowner because land ownership has been recognized to serve as a basis for a particular social group claim. So when he mentioned that, that should have triggered further questioning from the immigration judge. And it's not just on this particular social group element that there was a failure, the judge's failure to develop the factual record. This was also an issue on the harm element because Mr. Pineda referenced the murder of two of his cousins. Let me let me ask you a question about that. That's where I was going to go is to deal with the convention of future harm. According to Mr. Pineda, unequivocally, the killers are in the United States. Doesn't that end the inquiry as to whether or not he would be subject to torture if he went back to Honduras? It seems to me that based on his testimony, the United States is probably a little bit more dangerous for him than Honduras. Your Honor, ultimately, since Mr. Pineda, he has he was detained for the majority of his time that he was in the United States. But more importantly, the extortion scheme that he was forced to join involved actors that were spread across the country. Because that's just a generalized this is generalized fear of country conditions. Your Honor, the distinction here is that Mr. Pineda's Mr. Pineda's fears are actually rooted in in actual in incidents that occurred to him. It's not a general it's not news reports or general fear of country conditions, because back in 2017, he was stopped by police officers who forced him to join this extortion scheme. The officers were affiliated with the Honduran gang and those gang members. When Mr. Pineda tried to cut ties with this scheme, those gang members were the ones who came to his coffee plantation to murder his and eventually murder his family members. Though they were primarily motivated by the intention to kill him. And when he did try to relocate elsewhere, it was members of the same gang, which he stated in his in his hearing, that found and identified his whereabouts. And that's essentially what what led him to flee. And so his fear is based on incidents that were directly. His fear is essentially based on harm that's directly related to him rather than generalized country conditions. In fact, on the convention claim, the immigration judge's decision to deny his claim is rooted in substantial mischaracterizations of the factual record and misapplications of the law. First, the agency grossly minimized Mr. Pineda's harm because they did not consider the evidence that his cousins were murdered by these gang members who were who initially intended to kill him. And in WGA versus Sessions, this court held that harms committed against petitioners, close family members, particularly the murder of a family member, is key evidence of future torture in this in a holistic analysis of harm under the convention. And just like WGA, Mr. Pineda's close relations were murdered by gang members who were primarily motivated to kill him. And the agency's analysis of his harm doesn't reference these murders at all. In fact, Mr. Pineda's experiences amount to an even stronger threat of future torture than what the petitioner experienced in WGA because his cousins were murdered while he was in Honduras and on the very coffee plantation that he owned. In addition, the agency applied the incorrect legal standard to Mr. Pineda's relocation attempt. And your honors, if you have no further questions, I actually see that I will reserve the remainder of my time for rebuttal. Certainly, counsel. Mr. Spurlock. May it please the court. Good afternoon. Matthew Spurlock on behalf of the United States. In this case, substantial evidence supports the agency's decision that the harm that petitioner experienced when he was in Honduras did not rise to the level of persecution and also did not rise to the level of torture. What evidence in the record supports the finding that the uniformed police officers in a police vehicle were somehow rogue? That finding seemed entirely speculative and contrary to the record. Yes, your honor. I believe what you're speaking about in terms of finding would be the immigration judge's decision where she and in a footnote referenced the O.F.A.S. case and suggested that this was, as you just said, that this was not. I don't think that that issue was explored by the immigration judge and certainly not by the board on the question that you're asking about, your honor. I think that I don't, I don't, I think I can argue that it's correct, but I don't feel that the board analyzed that issue. The immigration judge appears to have ignored credible evidence that after he was threatened with murder, two of his cousins were murdered on his land by persons looking for him on two different occasions. Why does that evidence not compel a finding that he would face persecution on his return to Honduras? Why, why are we talking about generalized country conditions? But this is very specific evidence involving this individual, this pro se individual. Yes, your honor, that's an excellent question. He did testify that a cousin was murdered in June of 2018. He does say that he had another cousin that was executed, but he does not give a timeline and he does not say when that occurred or who caused that execution. You can, the petitioner sort of infers in the briefing that that's what he was talking about, but it's not clear. One important issue is the fact that he testified that his cousin was murdered in June of 2018. Keep in mind, your honor, that he was removed back to Honduras from the United States in May of 2017. And it wasn't until August of 2017 that he had any problems and he had one issue with three individuals who were addressed as police officers. That is, that is the one time in the record that he was threatened with death. That's the one time in the record that he talks about any sort of harm whatsoever, that he was simply slapped in the face and that they extorted money from him and threatened him if he didn't pay, he would be killed. Is it harm to have to run away from your home and relocate somewhere within the country? And, you know, in finding that he successfully relocated within the country, the immigration judge ignored testimony that the people who came to his hideaway asking about his car were armed and that he lived in hiding while there. Now, because the judge found that his account was credible, why wouldn't those facts not compel a conclusion that his relocation was not successful? I mean, what's successful about hiding in your apartment, you know, many, many miles away from your home? Yes, Your Honor. I would first address that question. You're concerned with the evidence that he he said that he left. He left his the farm, I suppose, the coffee farm sometime in 2017, maybe August. But he says that he wasn't first he wasn't asked again by the three individuals who stopped him in the police car. He didn't hear from them again or he wasn't questioned by them again until January 2018 at the earliest. He doesn't say anything about any threats or anybody contacting family members or any sort of personal contact whatsoever with anybody from the police or from the mafia or anybody until April 2019, which is well over a year after that. Now, I understand the point that he says that I was I was scared the whole time I was afraid of bullets going through my chest as they did with my cousin. I understand that, Your Honor. But also, the thing that sort of clarifies that a little bit is if you look at his reasonable fear statement, he talks about a lot of the same fears that all individuals in I'm sorry, Honduras experience. Are they all hiding somewhere? My goodness. Well, Your Honor, keep in mind also that the individuals that showed up at his apartment well over a year after after the time that he had last heard of any threats from the individuals who pulled them over. He didn't know who these individuals were. He didn't speak to the individuals. He had no idea who they were. His only it's basically speculation that these individuals were tied directly to the individuals who had extorted him well over a year earlier. I know. Look, if if a police car drove up to my house with wearing uniforms and and and and, you know, I would go to the door. And I would be sure they were police. I mean, I don't know where this speculation comes in. They're in police uniform. They're in a police car. They face value. They're they're police. And, you know, in finding no past persecution, the immigration judge focused on the lack of physical harm to him. But that ignores our case law that holds that threats directed toward the applicant but carried out against family members can may constitute persecution. You know, in L.A. He cited that case. The government made no attempt to distinguish it. Can you distinguish it? Your Honor, first, if I can address your first point that you made with regard to the individuals who showed up at his apartment over a year after the last contact he had with the officers who were extorting him. There's no evidence at all that those individuals were dressed as police officers or that he had any recognition of them whatsoever. He did not know who they were. I think it's fair to say that he assumed that they were they were involved with with the mafia or some degree. But that really does go to what the speculation is. We don't know who they were. We do know that the only individuals that that actually committed fairly serious harm are the individuals who killed his cousin, who he says he knows for certainty 100 percent that those individuals are now in the United States. And to get to your point, Your Honor, about N.L.A., I would I would say that we can distinguish N.L.A. because, first of all, this this isn't a derivative claim situation is what we had in N.L.A. That's the first difference. There's no derivative claim controversy here. The second point I would make the difference in this case with N.L.A. N.L.A., you had a very clear persecutor at issue and you had a very clear motive of the persecutor, which was, of course, Spark. Here we don't what we have is a general situation in Honduras of corruption, of widespread violence and crime. And that's that's exactly what Petitioner in this case has indicated that he fears he doesn't know. No, forgive me. There was no evidence of what they wore when when these people approached the hideaway, you know, just that they were armed. So, yeah, that's correct. That's correct, Your Honor. And I think the important part out of that, that interchange during the testimony was that he was asked, did you know who those individuals were? He testified, yeah, of course I did. But you earlier testified that you didn't recognize them. And he clarified, yeah, OK, they weren't the same people who were involved in the earlier crime. But these people are all the same. They're all not. That's the point I was making, Your Honor. My time has run out. Thank you. And thank you for your responses. Thank you, counsel. Anything further, Ms. Collard? Your Honors, to respondent's point about Petitioner's harm, Mr. Pineda's harm, what the agency and respondent tried to confine Mr. Pineda's harm to that August 2017 police stop and to reframe his harm as generalized violence. But here he's presented direct evidence of harms committed against him. And the reason why there is no further information about the murder of his second cousin, it's not because it's speculative. It's because the immigration judge failed to follow up on that particular testimony. And in fact, it's not just that. To respondent's other point about a potentially speculative claim, the reason why we don't know how Mr. Pineda knew that those gang members who identified him after he relocated were of the same gang is once again because the immigration judge did not sufficiently follow up on that point. I see my time is up. Thank you, Your Honors. Thank you very much. The case is taken under advisement and the court will be in recess.